Filed 7/20/15  Jose S. v. Superior Court CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOSE S. et al.,<br><br>Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>Respondent;<br><br>SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al.,<br><br>Real Parties in Interest. | D067784<br><br>(San Diego County Super. Ct. No. J517952) |

PROCEEDINGS in mandate after referral to a Welfare and Institutions Code section 366.26 hearing.[1]  Kimberlee A. Lagotta, Judge.  Petitions denied; requests for stay denied.

---

[1]     Further statutory references are to the Welfare and Institutions Code.

Dependency Legal Group of San Diego and Amanda J. Gonzales for Petitioner Jose S.

Dependency Legal Group of San Diego and John P. McCurley for Petitioner L.C.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

Dependency Legal Group of San Diego and Natasha Edwards for Real Party In Interest, Dominic S., a Minor.

Presumed father Jose S. and mother L.C. (together, the parents) seek writ review of the juvenile dependency court's order, made at the six-month review hearing, terminating reunification services and setting a section 366.26 hearing for 10-month-old Dominic S. The parents contend there is no substantial evidence to support the finding they received reasonable services. We deny the parents' petitions and requests for a stay.

FACTUAL AND PROCEDURAL BACKGROUND

*Introduction*

Jose has been a client of the Regional Center since infancy. He has a history of marijuana use and "anger issues." L.C. has suffered from a seizure disorder since childhood. When she was in high school, she had an Individualized Educational Program due to a learning disability. She has a history of mental health issues (including depression with psychotic features), domestic violence and use of opiates and marijuana.

Beginning in November 2008, L.C. received voluntary services following reports that she had left her three oldest children with strangers when those children were

2

between eight months and one and one-half years old. The voluntary services included "Regional Center, Respite, . . . [public health nurse], and Sunny Days,"[2] which L.C. completed, and counseling and in-home support, which she did not complete. She participated in parent-child attunement therapy, but stopped attending. She did not address her domestic violence issues. When voluntary services ended in September 2009, after approximately nine months, L.C. "still appeared to have limited insight into her children's needs."

In October 2010, a dependency case was opened for L.C.'s three oldest children, based on neglect, and for her fourth child, an infant, based on abuse of the siblings.[3] L.C. admitted hitting her children. She received reunification services including a domestic violence program, general counseling and parenting education. She completed a parenting program. She did not provide attendance sheets from the domestic violence program. Her therapist ended treatment after four months because L.C. refused to cooperate and had made no progress. The therapist said L.C. was "mentally disabled," which rendered her incapable of caring for herself or her children, and was "incapable of utilizing services to deal with the protective issue." In early 2012, L.C.'s reunification services were terminated and the father of her fourth child reunified with that child. In March 2013, L.C.'s parental rights to her three oldest children were terminated.

---

[2] The record does not describe "Sunny Days" services.

[3] Jose is not the father of L.C.'s four oldest children. He has a child older than Dominic; that child was not in Jose's care.

3

*The Instant Case*

When Dominic was born in May 2014, L.C. tested positive for benzodiazepines (antianxiety medication) and the parents appeared to be "very delayed." Personnel from the San Diego County Health and Human Services Agency (the Agency) met with the parents, their pastor, their friend, Jose's Regional Center worker and hospital staff. Agency personnel discussed their concerns including L.C.'s history of domestic violence, unstable housing and limited baby supplies; the removal of her older children; her seizure disorder; and the parents' disclosure of daily marijuana use.[4] The Agency verified that the parents had baby supplies and before Dominic was discharged from the hospital, the parents were able to articulate that he needed feeding every two to three hours.

After Dominic was discharged, the parents fed him inconsistently and inadequately. The parents admitted they did not feed him at night, saying he wanted to sleep. On May 30, 2014, Dominic's doctor admitted him to the hospital because he had lost weight and suffered from reflux. Dominic's liver enzymes were elevated. He gained weight in the hospital and was discharged on June 5. The parents were given feeding instructions and told to see the doctor the next day. They did not appear for the appointment.

On June 12, 2014, the parents took Dominic to the doctor. The parents told the doctor they had fed Dominic only once the previous night. The doctor noted Dominic

---

4     L.C. said that Jose smoked marijuana for his depression. Jose said he had reduced his use. L.C. said she had smoked marijuana in the past but was not doing so currently.

was doing well and told the parents to feed him every two to three hours, for 15 minutes on each breast, and to feed him at least two to three times each night.

On June 13, 2014, Agency social worker Elvin Gonzales contacted L.C. L.C. said Dominic's doctor had told her to feed Dominic every two to three hours, for 15 minutes on each breast. According to L.C., Dominic was "doing good."

At an appointment on June 16, 2014, the doctor noted Dominic had gained a few ounces, which was not enough. L.C. told the doctor she was feeding Dominic four times a night. The doctor instructed L.C. on the use of a breast pump and told the parents to bottle feed Dominic in order to measure his intake. The doctor sought to rule out reflux as a cause of Dominic's failure to thrive. The doctor debated whether to admit Dominic to the hospital again, but decided "to give the parents one more chance."

Between June 16 and 19, 2014, Dominic lost four ounces. Dominic's doctor believed the parents had good intentions, but were incapable of understanding the importance of feeding him. L.C. told the doctor that one night she had fed Dominic water. For several nights, the parents had allowed Dominic to sleep through the night with no feedings.

On June 19, 2014, Dominic was admitted to the hospital due to failure to thrive. He was emaciated and weighed less than he had when last discharged from the hospital. At the hospital, the parents had to be prompted to feed him. L.C.'s seizure medication caused her to sleep most of the time. The parents slept instead of feeding Dominic as scheduled. On two separate occasions, the parents slept while a nurse fed Dominic. When Jose attempted to feed Dominic, he watched television at the same time, ignored

5

Dominic and failed to respond when the nurse twice told him to burp Dominic. L.C. was also distracted by the television.

On June 20, 2014, L.C. acknowledged that Dominic had lost weight. She blamed this on his thyroid problem and claimed she was feeding him as directed. Hospital personnel did not find any thyroid problem. A hospital doctor believed L.C. "does not grasp the medical situation."

While in the hospital, Dominic gained weight and his liver enzyme levels improved. The doctors determined his previous weight loss was due to the parents' inadequate feeding and the previous elevation of liver enzymes was due to malnutrition. On June 23, 2014, Gonzales met with the parents. The parents insisted they fed Dominic as directed and his weight loss had been caused by diarrhea.

The Agency referred the parents to SafeCare[5] and the public health nurse. The parents repeatedly expressed their disinclination to cooperate with the Agency. They did not drug test when Gonzales asked them to do so. On June 23, 2014, Dominic was detained in the hospital. He was moved to a confidential foster home that day.

On June 25, 2014, the Agency filed a dependency petition for one-month-old Dominic. The petition alleged he had been hospitalized twice in one month due to failure to thrive based on inadequate and inconsistent feeding. At the June 26 detention hearing, the court ordered the Agency to provide the parents voluntary services. The court warned the parents that because Dominic was younger than three years when detained, they

---

5 The record does not disclose the nature of SafeCare.

might have only six months in which to participate regularly and make substantive progress in services. (§ 361.5, subd. (a)(1)(B).)

On July 11, 2014, social worker Sandra Moreno met with the parents. When Moreno asked why the parents thought Dominic was in custody, L.C. replied, "Nobody told me that my medicine was causing my milk to be bad." L.C. claimed she had followed the hospital's feeding instructions and denied failing to feed Dominic at night. Jose said Dominic was in custody because "all of you think we are not taking care of him and can't watch him." Jose said he and L.C. could care for Dominic and denied they failed to awaken to feed him during the night. Jose acknowledged near daily use of marijuana although he did not have a medical marijuana card. He admitted having anger issues and suffering from mild depression, but said he did not like speaking to therapists or taking medication. Moreno gave the parents information about voluntary services and gave L.C. referrals to therapy, substance abuse counseling and parenting classes.

In her jurisdictional and dispositional report, Moreno stated the Agency was "considering not offering services to [the parents], depending on results of psychological evaluation." The Agency requested two psychological evaluations for Jose and two for L.C. in order to determine how their "mental health concerns . . . will impact their ability to benefit from services and safely parent a delicate growing newborn." On July 15, 2014, the court authorized the evaluations; there were no objections from the parents' counsel. On July 31, Moreno gave the parents bus passes and referrals to therapy. The parents said they did not want the names of psychological evaluators because, on the advice of their attorneys, they were not going to participate in the evaluations.

7

On August 3, 2014, Jose was arrested for battering L.C. L.C. denied there was any domestic violence. On August 6, the parents completed a parenting class. On August 13, L.C. had an intake appointment with therapist Kasimu Harley. Jose had not started therapy; L.C. said he was waiting for a call from a therapist.

On August 14, 2014, the court entered a true finding on the petition, ordered Dominic placed in foster care and ordered reunification services for the parents. Services included two psychological evaluations for each parent, individual counseling with approved therapists, parenting education and referral to and evaluation by the family preservation services program.[6] The court again warned the parents that because Dominic was younger than three years when detained, they might have only six months in which to reunify.

On October 8, 2014, L.C. began therapy with Jack Sullivan. In December, Sullivan reported that L.C. had attended five sessions and missed two. L.C. seemed "to have cognition distortions relating [to Dominic's] care," disbelieved reports by the Agency that he was now thriving and did "not appear to understand her role in the neglect." L.C.'s frequent seizures, mental health symptoms, inadequate support system and difficulty setting boundaries with Jose appeared to be "a serious impediment" to her ability to care for herself and Dominic.

---

[6] This program "provided assistance with referrals for affordable housing, parent training and demonstration and household management." The parents were unable to participate in the program because it required them to be within 30 days of achieving Dominic's return home, and they never reached that point. Thus, the Agency did not refer them to this program.

Meanwhile, social worker Patrice Clark was assigned to this case on October 10, 2014, and reviewed the case plan with the parents. L.C. was able to articulate some of what she had learned in the parenting class. Clark did not offer another parenting class because L.C. said she was not interested. Jose received services through the Regional Center, and Clark gave him additional referrals to therapy. Jose began therapy with Kim Murphy, but Murphy terminated therapy due to Jose's noncompliance and repeated failure to attend appointments. Murphy reported "Jose presents with limited insight regarding parenting a child as evidence[d] by the lack of follow through with appointments and continued substance abuse/alcohol."

In December 2014, L.C. told Clark that L.C. "was experiencing domestic violence with [Jose] and wanted to move out." Agency personnel gave L.C. housing referrals and drove her to a friend's house. L.C. said she would obtain a restraining order. When Clark asked Jose if he had ever hurt L.C., he replied, "Only one time a long time ago. I hit her." L.C. did not obtain a restraining order and resumed living with Jose after a week or two, against Clark's advice.

After this violence, the parents were required to visit Dominic separately. The parents were often late to visits and did not ask how he was doing. At Christmas, the parents did not bring Dominic gifts.

L.C. visited Dominic twice a week. She held him, changed his diapers and fed him. At first, L.C. brought age-inappropriate food to visits, and Dominic suffered from an allergic rash and diarrhea after visits. Clark and the foster parent talked to L.C. about this, and after that Clark did not hear of further problems with food. L.C. was informed

9

of Dominic's medical appointments and attended some of them, but was unable to articulate any information about the appointments.  She was not allowed to attend Dominic's physical therapy and occupational therapy appointments, which took place in the confidential foster home.

Jose also visited Dominic and participated in medical appointments.  Like L.C., Jose initially brought age-inappropriate food to visits.  Jose did not know how to relate to Dominic; he stared at him and spent most of the time pulling his clothes up and looking at his skin.  During a visit in early March 2015, Jose did not interact much with Dominic.  Jose told Clark that he had made a therapy appointment for March 23.

*The Psychological Evaluations*

Psychologist Katherine Ellis-Hernandez evaluated L.C. on November 6 and 10, 2014.  Dr. Ellis-Hernandez's November 17 report stated the following.  L.C. "appears to have difficulty accepting responsibility and demonstrating insight into how her behaviors may cause emotional or physical harm to [Dominic]" and "appears to lack understanding and insight into her need for treatment which is exacerbated by delusional and paranoid fixed beliefs regarding [the Agency]'s involvement."  L.C.'s "cognitive and intellectual impairment . . . impede her ability to benefit from services."  Her "severe depression and pervasive personality dysfunction characterized by psychotic symptoms, severe interpersonal conflicts, emotional dysregulation, level of motivation, non-compliance with treatment, and lack of insight and awareness regarding her mental health issues will likely impede [her] ability to benefit from services and would render her 'incapable of utilizing reunification services' at this time."  L.C.'s "symptoms are chronic and will

10

likely require treatment across the lifespan" and her "lack of awareness, insight and fixed delusions are likely to impede her ability to benefit from services and meet expected goals within the six[-]month legal deadline."  Dr. Ellis-Hernandez concluded:  "If the court should continue to offer services, it is highly recommended that [L.C.] be evaluated by a psychiatrist for medication recommendations and receive a neurological evaluation to address complications related to her epileptic seizure disorder.  In addition, [L.C.] would benefit from individual therapy . . . to increase her ability to protect her child and/or parent safely."

Psychologist Abraham Loebenstein evaluated L.C. on December 21, 2014.  Dr. Loebenstein's January 29, 2015, report noted "[t]his evaluation was initially ordered to be completed sometime during the summer, with [L.C.] being very resistant at the time to participate."  Dr. Loebenstein concluded that L.C. had "a serious mental illness"; it appeared to incapacitate her and "would be disabling" "[w]ithout treatment."  Her mental disorders were treatable, "with the biggest hurdle being her willingness to participate, and her ability to stay consistent with her treatment."  While her history suggested "her prognosis is not good," it was possible that she might improve substantially over the next 12 months if she accepted her need for treatment and participated fully.  Although L.C.'s intelligence was below average, she "has sufficient intelligence to participate in treatment and to follow guidelines."  She was capable of "psychotic like thinking" and her mental stability had to be addressed before she would be able to benefit from services such as parenting education."  Dr. Loebenstein recommended the monitoring of L.C.'s abstention from the use of marijuana and other illicit substances; a psychiatric consultation;

11

psychotherapy; parenting education once L.C. demonstrated progress in the foregoing areas; residential substance abuse treatment if she had trouble maintaining sobriety; and a neuropsychological screening should the court find it beneficial.

Psychologist E. Warren O'Meara evaluated Jose on January 15, 2015. Dr. O'Meara's January 22 report concluded that Jose's mental disability, exposure to domestic violence while a child and poor impulse control impeded his ability to parent and "[h]is low intellectual capacity renders him unable to safely parent." Jose's low IQ (in the .2 to 3 percentile range) and poor comprehension abilities, judgment and insight made it "unlikely that he would benefit from services, especially within the timelines." Dr. O'Meara noted that Jose was not in therapy and should not be referred to therapy.

Psychologist M. Bruce Stubbs evaluated Jose on February 25, 2015. Dr. Stubbs's March 4 report cited Jose's low IQ, history of domestic violence and lack of insight and concluded Jose's mental disability rendered him incapable of caring for any child appropriately and incapable of utilizing reunification services regardless of the length of the reunification period. Dr. Stubbs noted that Jose minimized his domestic violence; asserted that the parents had done everything they believed appropriate in caring for Dominic; and never said they were doing everything they had been instructed to do.[7]

*The Six-Month Review Hearing*

At the time of the March 27, 2015, six-month review hearing, Dominic continued to have special needs requiring services. In addition to physical and occupational

[7] Clark transported Jose to both of his psychological evaluations after Jose missed his first appointment with Dr. O'Meara.

12

therapy, he participated in a failure-to-thrive clinic and was under the care of a renal specialist. He had at least one appointment a week.

L.C. was still attending therapy and was in compliance with the therapy component of her services plan. The Agency had not given her referrals for a neurological or psychiatric evaluation, as recommended by Dr. Ellis-Hernandez and Dr. Loebenstein, but L.C. had a psychiatric referral from her therapist, had a psychiatric appointment set for the day of the hearing and saw a neurologist when she needed a new prescription for her seizure medication. L.C. testified she would take another parenting class if the social worker asked her to. L.C. was living with Jose. She had returned to him because she had no other place to live, but there were other people who would take her in. L.C. would move "[if] the opportunity comes up . . . and it's needed." By "needed," she meant that she wanted a bigger home for Dominic. Jose was supporting L.C., but she received food stamps and was applying for Supplemental Security Income.

The court found the parents had been provided reasonable reunification services, terminated services and set a section 366.26 hearing.

The parents petitioned for review of the court's orders. (§ 366.26, subd. (*l*); Cal. Rules of Court, rule 8.452.) This court issued an order to show cause, the Agency responded and the court heard oral argument at the parents' request.

## DISCUSSION

L.C. contends the Agency failed to provide services tailored to her special mental health needs. She argues the psychological evaluations took place "late in the reunification period, the Agency did not use the evaluations to match [her] to the

13

appropriate services" and instead used them to justify its failure to provide her reasonable services. Jose contends the Agency failed to provide services tailored to his developmental disability. He argues the Agency delayed in providing psychological evaluations and other services and did not arrange interactive parent training, coordinate with the Regional Center or notify him of Dominic's physical therapy appointments and allow him to attend. Jose also argues the Agency used the psychological evaluations to justify terminating services rather than to assist him with services.

"Reunification services should be tailored to the particular needs of the family." (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1425.) The court and the Agency "must accommodate the special needs of disabled . . . parents." (*Id*. at pp. 1425-1426.) "To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .' [Citation.]" (*Id*. at p. 1426.) "The effort must be made to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success." (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1011.)

" 'It is . . . well established that "[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent. [Citation.]" ' " (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233, quoting *In re Jonathan R*. (1989) 211 Cal.App.3d 1214, 1220.) There is no " 'requirement that a social worker take the parent by the hand and escort him

14

or her to and through [services].' " (*In re Nolan W.*, *supra*, at p. 1233, quoting *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.) " 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598-599, quoting *In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) In "[determining] whether substantial evidence supports the trial court's [reasonable services] finding, [we review] the evidence in a light most favorable to the prevailing party[,] and [indulge] in all legitimate and reasonable inferences to uphold the court's ruling." (*Katie V. v. Superior Court, supra*, at p. 598.)

Before filing the dependency petition, the Agency offered the parents services; the parents declined to cooperate. Dominic's doctor repeatedly instructed the parents how to feed Dominic properly and adequately, to no avail. L.C. had received extensive services in connection with the dependencies of her older children, but had failed to reunify. L.C.'s therapist during a prior case concluded L.C. was incapable of utilizing services and her mental disability rendered her incapable of protecting and caring for her children.

The parents cannot now challenge the services ordered as part of the case plan or other findings and orders made at disposition. (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 811.) We need not discuss their contentions that the Agency requested psychological evaluations solely to justify terminating services and "[t]he questions provided to the psychological evaluators were questions which would provide the information needed to bypass reunification services under section 361.5, subdivision (b)(2)." We need not address Jose's contention "there is no indication that the Agency

15

provided domestic violence services" because the case plan did not include such services as a discrete component.

As noted above, the case plan consisted of psychological evaluations, individual counseling, parenting education and referral to and evaluation by the family preservation services program. The reunification period lasted from August 14, 2014, to March 27, 2015, more than seven months. The parents completed only a parenting class and the psychological evaluations.

The parents declined to participate in psychological evaluations before the jurisdictional and dispositional hearing, citing the advice of counsel, although counsel voiced no objection to the court.[8] L.C.'s first psychological evaluation took place in early November 2014, before the midpoint of the reunification period. Because she arrived late for her appointment, the first evaluation took place over a span of five days, rather than being completed in one day. L.C.'s second evaluation took place approximately six weeks later, in late December, after the midpoint of the reunification period, and was delayed by her resistance. Jose's first psychological evaluation took place in mid-January 2015, five months into the reunification period, after he missed his

---

[8]    While "a court has no authority to order a psychological evaluation of a parent until it has exercised dependency jurisdiction" (*In re C.C.* (2003) 111 Cal.App.4th 76, 91), it is disingenuous of the parents to complain the evaluations were delayed under these circumstances.

first appointment.[9]  His second evaluation took place in late February, approximately one month before the end of the reunification period.

Dr. Ellis-Hernandez, the first psychologist to evaluate L.C., concluded L.C. was incapable of participating in services and her ability to benefit from services was impeded, particularly within the six-month reunification period.  Dr. Ellis-Hernandez recommended that if the court continued to offer services, L.C. should receive a psychiatric medication evaluation and a neurological evaluation.  Because the court terminated services, the premise of this recommendation did not occur.  Moreover, the court noted that L.C. had received neurological care and medication for many years.  Individual therapy, Dr. Ellis-Hernandez's additional recommendation, had already started, and L.C. received a psychiatric referral from her therapist.  Dr. Loebenstein, the second psychologist to evaluate L.C., concluded her mental illness would be disabling without treatment, and if she overcame her unwillingness to accept treatment, she might improve over 12 months, longer than the six-month limit on services.  In light of this conclusion, Dr. Loebenstein's recommendation of a psychiatric consultation was moot.  Furthermore, he conditioned his recommendation of a neuropsychological screening on a finding by the court that it would be beneficial; the court found it would not be beneficial, noting L.C. was already under the care of a neurological specialist.  In light of Dr. Ellis-Hernandez's conclusion that L.C. had an impeded ability to benefit from services within the six-month period and Dr. Loebenstein's conclusion that any possible improvement

---

[9]     The record does not reveal the date of the first appointment.

would take 12 months, earlier evaluations would have made no difference and further services would have been an unwise use of resources. (*In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 881.)

Before this case, L.C. had a history of involvement in violent relationships and failure to address those issues through offered services. During the pendency of this case, she returned to Jose despite his violence. She was living with him at the time of the hearing and failed to see why this was inappropriate.

Dr. O'Meara, the first psychologist to evaluate Jose, concluded that his intellectual deficit made him incapable of safe parenting and he was unlikely to benefit from services. Thus, Dr. O'Meara recommended against a referral to therapy. Dr. Stubbs, the second psychologist to evaluate Jose, concluded his mental disability rendered him incapable of appropriate parenting and incapable of utilizing reunification services. It is clear from the conclusions of both psychologists that earlier evaluations would have made no difference and the continued provision of services would have been fruitless. (*In re Katelynn Y.*, *supra*, 209 Cal.App.4th at p. 881.)

Before the dependency petition was filed, Jose said he had told his Regional Center worker not to talk to the Agency because Jose had not signed a release. Nevertheless, the Agency communicated with Jose's Regional Center worker before filing the petition and Regional Center personnel attended some of the hearings. The reunification plan did not require the Agency to coordinate with the Regional Center.

Jose was ineligible for interactive parent training provided by the family preservation services program because Dominic's return never became imminent.

18

Although Jose had completed a parenting class, the psychological evaluators concluded he was incapable of proper parenting, incapable of participating in services and unlikely to benefit from services. Given those conclusions, Jose's inability to carry on a conversation, his failure to attend his own therapy appointments and his failure to ask about Dominic's well-being, any failure to notify Jose of Dominic's recently begun physical therapy appointments is of no moment.

The Agency offered the parents reasonable services in conformity with the case plan. Under the circumstances of the instant case, it would have been unreasonable for the Agency to have done anything further. (See *In re K.C.* (2012) 212 Cal.App.4th 323, 333-334.) Any lack of services did not result from any failure of the Agency, but rather from the parents' refusal to accept the assistance they were offered. Substantial evidence supports the court's reasonable services finding.

## DISPOSITION

The petitions are denied. The requests for a stay are denied.


NARES, Acting P. J.

WE CONCUR:


HALLER, J.


McDONALD, J.